ALECK BROWN v. THE STATE.

*No. 3. Decided May 6.*

1. **Constitutional Law — Legislation at Special Session — Governor's Proclamation as to Matters to be Considered.** — It is provided by article 4, section 8, of the State Constitution, that when the Governor convenes the Legislature on extraordinary occasions, "his proclamation therefor shall state specifically the purpose for which the Legislature is convened;" and by section 40 of article 3 it is also provided, that "when the Legislature shall be convened in special session there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session, or presented to them by the Governor," etc. *Held*, it was not the intention of these provisions to require the Governor to define, in his proclamation, with precision as to detail, the subjects of legislation, but only in a general way by his call to confine the business to the particular subjects indicated.

2. **Same — Reapportionment of Judicial Districts.**—Where, among other subjects, the proclamation of the Governor calling a special session convened the Legislature "to reapportion the State into judicial districts," *held*, that the judicial districts mentioned in the proclamation were those presided over by the district judges; that the authority to reapportion or reorganize the judicial districts of the entire State necessarily carried with it the power to reapportion any given number of such districts, and that it was for the Legislature, and not the Governor, to determine what the legislation should be, with regard to such reapportionment.

**3. Caption of Legislative Act Creating a Judicial District.**—The caption of an act creating a judicial district is not violative of section 35 of article 3 of the Constitution, providing, that "no bill  *  *  *  shall contain more than one subject, which shall be expressed in its title," because it omits to state the different counties constituting the newly created district, nor that one or more of the counties composing such district was or were transferred from some adjoining district.

**4. Challenge to Array of Grand Jury.**—In order for a party confined in jail to avail himself of the right to challenge the array of the grand jury, as provided by article 377, Code of Criminal Procedure, it is necessary that he should make a request to be brought from jail for that purpose.

**5. Continuance.**—Where the murder was committed in October, and defendant filed his application for continuance in January, in order that the blood found upon his clothing might be analyzed, *held*, there was a total want of diligence, and that the continuance was properly refused. *Held*, further, that such analysis could not have been material where the defendant's proposition was to show thereby that the blood stains came from a squirrel he had dressed on the morning of the homicide, while the evidence, both for the State and the defendant, showed that he did not dress the squirrel.

**6. Practice — Bill of Exceptions, Judge's Explanation Contradictory of.**—If the judge's explanation attached to a bill of exceptions contradicts the facts stated in said bill, such explanation will be held to correctly state the matter at issue.

**7. Evidence—Silence of Party when Accused of Crime.**—It was not error to permit the State to prove that the husband of deceased said to defendant, when they met at the body of the murdered woman, "Aleck, you have killed my wife," and that defendant made no reply, but walked off.

**8. Verdict Returned on Sunday.**—It is not error to receive and record a verdict on Sunday.

**9. Judgments—Presumptions in Favor of.**—Presumptions are always indulged in aid and support of the judgment, and the party attacking the judgment must overcome such presumptions.

**10. Manslaughter.**—Where the evidence does not raise the issue of manslaughter, it is proper that the court should decline to instruct upon that issue.

**11. Murder of First Degree.**—See evidence upon which the court holds, that a verdict and judgment for murder of the first degree, with the infliction of the death penalty, was amply supported.

APPEAL from the District Court of Bastrop.    Tried below before Hon. LAFAYETTE KIRK.

Appellant was indicted for the murder of Jane Wilkins, by striking and cutting her with an axe.    At his trial he was found guilty of murder in the first degree, and his punishment assessed at death.

Defendant filed a plea to the jurisdiction of the court, in which he attacked the constitutionality of the Act of the called session of the Twenty-second Legislature, organizing and establishing the Twenty-first Judicial District of the State of Texas, and transferring the county of Bastrop from the Twenty-second Judicial District, to which it belonged, and making it a part of the said Twenty-first Judicial District.

The constitutional objections were: first, that the act does not express

in its title the real purpose thereof, or the real subject matter contained therein; second, that the proclamation of the Governor calling the special session of the Twenty-second Legislature, which passed said act, did not present to said Legislature the matter contained in said act as subject for legislation; third, that said act being void, no legal term of court could be held at the time said case was called for trial.

This plea to the jurisdiction was overruled. The same matter was again presented on motion to quash the indictment in the case; and another ground set up in said motion to quash was, " because the defendant was not allowed an opportunity to challenge the array or any member of the grand jury that returned the indictment against him, he being, at the time said grand jury was empanelled, confined in the county jail, and not being present in person or represented by counsel, and not knowing that the said grand jury was being empanelled."

This motion to quash having been overruled, appellant filed a motion for a continuance, that an opportunity might be afforded him of having certain blood spots, which were found upon his clothing and introduced in evidence by the State, subjected to chemical analysis and microscopic examination, in order that it might be ascertained whether the blood found was that of a human being or of some other animal; his application alleging that the blood was from a squirrel which he had dressed the day of and before the homicide.

The evidence adduced in the case is as follows, viz.:

J. F. Nash, witness for the State, being duly sworn, testified as follows: I hold the position of marshal of the town of Bastrop. I heard of the killing of Jane Wilkins, who was Oliver Wilkins' wife, on the night of October 15, 1892. It occurred in the town and county of Bastrop, in the State of Texas. It was sometime about 10 o'clock when I heard of it. When I got there I found the body lying in the yard, between the two doors on the south side of the house. It was lying on the face, with the hands under it. There were two deep gashes in the head, and one in the shoulder. There was an axe lying beside the body, and covered with blood. There was blood on the ground around the body, and blood on the wall of the house near the body, as high as five feet from the ground. There was also a bloody axe lying on the ground, near the body. Ben Holiday lives in the southwest corner of the block on which the Wilkins house is situated. Darcas Gage lives on the northeast corner, and the Wilkins house is on the northwest corner. Ann Morrison and her husband, Frank Morrison, live across the street from Oliver Wilkins— directly north. I think the street is about 15 feet wide, and Morrison's house is some 10 feet from the street. Oliver Wilkins' house faces south. It is about 60 or 70 yards from deceased's house to Ben Holiday's. It is about 75 to 100 yards to John Kerr's from Oliver Wilkins' house. There

was some blood on a top plank of Wilkins' yard fence, south of the gate, made by finger prints. The finger prints, in blood, were about two inches below the top edge of the plank, and the plank was broken. Aleck Brown, the defendant, was arrested sometime in the summer before the killing occurred, for disturbing the peace, and he pleaded guilty, and paid part of his fine, and worked the rest out on the street. He was charged with disturbing the peace.

Cross-examined: Oliver Wilkins, the husband of Jane Wilkins, the deceased, made the complaint against Aleck Brown, for disturbing the peace. The body of Jane Wilkins was found on the south side of the house, a few feet from the door of the main room, nearest the door of the east room. This east room is an old room, not used much. There was nothing in it. The feet were directly under the eaves of the house. The head was directly south, as though she had been standing with her back to the wall. I don't think it was over five minutes after I heard of the killing until I got there. There were a good many there when I got there. Aleck Brown, John Kerr, Ben Holiday, and Aunt Darcas Gage were there when I got there. Aleck Brown went after Oliver Wilkins, the husband of the deceased. I think he went after him of his own accord. When Oliver got there I noticed him, and he seemed very much excited. He went and got his gun and went out in the garden. Aleck Brown lives 200 yards or more from Wilkins' house, a little west of south of Wilkins' house. The blocks are divided into squares of three acres tracts. Oliver Wilkins' house, where deceased was killed, is in the northwest corner of one three acres block, and Darcas Gage's house is near the southeast corner of the same block, and about 45 yards distant. Frank Morrison's house, where Ann Morrison lives, is on the block immediately north of Oliver Wilkins', and Ben Holiday's house is on the same block the Wilkins house is on, and in the same southwest corner. Dally Nunn's house is on the same block with Frank Morrison's house, and in the northeast corner of same. Kerr's house is a little south of east from Wilkins' house, and between 75 and 100 yards distant. Aleck Brown's house is a little west of south from Oliver Wilkins' house, and about 200 yards distant. In going the most direct route from Oliver Wilkins' house to defendant's, you would pass by the Ben Holiday house. In going from the Ben Holiday house to the Taylor house, in the most direct route, you would pass by Oliver Wilkins' house. Maria Gage lives about one-quarter of a mile from Ben Holiday's house, a little east of north. These three acres blocks are surrounded by streets. Ben Holiday's house is the only one you would necessarily pass in going from Oliver Wilkins' to defendant's, by the most direct route. Immediately north of defendant's house is an enclosed three acres block, with no houses or improvements on it.

The following is a correct plat of the grounds and houses, and was introduced in evidence by the State:

Darcas Gage, for the State, being sworn, testified as follows: I am the mother of Jane Wilkins, the deceased. The first time I knew Jane was dead, Ann Morrison came to my house and called me, and said, "I think some one has killed or hurt Jane." I went up there, and found her lying on the ground, with her head cut open, and a bloody axe lying near her. I screamed, and kept a-screaming. No one came, and I went back and put on my clothes. When I came back, John Kerr came. His nephew, Walter Wheeler, came with him, and shortly afterwards Aleck Brown came, and he stooped over Jane and said, "Yes; sure enough, she is dead." Aleck said to John Kerr, "Let's put her in the house." Kerr said, "No." Aleck walked off, put his elbows on the fence, and leaned his head on his hands. I said, "Who will go after Oliver Wilkins?" and Aleck said, "I'll go." Before cotton picking time, Aleck and Jane had trouble, fussing and quarrelling. Aleck was frequently at Oliver Wilkins', both in the day and at night, while Oliver was absent, and no one at home.

Cross-examined, witness testified: Ann Morrison called me three times. I was asleep when Ann called me. When Oliver came up, he said, "There

is my poor wife.'' After Ann Morrison called me, I went right up, in my night linen. I put my hands on her head, and I thought she said, "Ma." The body was still warm. I screamed, and kept hallooing, "Some one has killed my poor child!" I went back, and dressed. I don't think it took me fifteen minutes. I went just as quick as I could. Jane Wilkins married Tobe Cook's father the first year of freedom. Aleck Brown was then only a baby.

Re-examined by the State: About four months before the death of deceased, the defendant and deceased were at Oliver Wilkins' house, quarrelling, and I went to them and tried to stop it, and defendant started off, and then stopped, and picked up a big stick of wood, and threw at deceased, and hit the fence; and I said, "Aleck, I am going to make your pocket blue for that;" and he said, "God damn you! I will make your heart bleed in less than six months," and then left. Oliver Wilkins' family consisted of only himself and wife, and a little 5 or 6-year-old boy, and no one lived at his place except this family.

J. F. Nash, recalled for the State, testified: He arrested the defendant on this charge on the night of the murder. Very shortly after witness got to Wilkins', being shortly after 10 o'clock, he had on no hat or coat or overshirt, and only a clean undershirt on the upper portion of his body. The sleeves he had on when arrested had some spots of blood on them at the time he was arrested. I went that night to defendant's house, and found a white straw hat and a pair of pants of defendant's, both of which had some spots of fresh blood on them; but I did not notice the blood on the hat and pants of defendant until the next morning, but noticed it on the shoes that night. The blood on the hat was a small spot on the under side of the brim, and a large spot on the band, and there were large spots on his shoes. The blood has faded away some, but I can see it on the hat and pants and shoes now. The deceased had been struck three times in the head and once in the shoulder, with the axe or some sharp, cutting instrument. The wounds were all deep ones, and the head was cut to pieces, and had to be tied up for burial.

Cross-examined, the witness J. F. Nash testified: The blood is plainer now on the hat band than it is now on the shoes and pants. When I first saw it, it was red, and looked like fresh blood. I could not tell the difference between blood put on the clothes at 10 a. m. and 7 p. m.

John Kerr, for the State, being sworn, testified: I live a little distance from the house of Jane Wilkins, the deceased. About 10 o'clock on the night Jane Wilkins was killed, I heard Aunt Darcas, the mother of deceased, screaming. I ran up there. When I got there, there was no one there but Jane's mother. The deceased was lying in a pool of blood, dead, and a bloody axe was lying near her. Her head was cut all to pieces with the axe, and I joined the pieces of her head together with my hands, and there was nothing holding together but a piece of skin. Aleck

Brown was the fourth man there. Darcas asked Aleck to go and get Oliver. When Oliver got there, he walked around the yard, wringing his hands, and said to defendant, "Aleck, you have killed my wife," and defendant made no reply, and walked off. When Aleck Brown came, he said, "What's the matter?" It was 10 o'clock, by my clock, when I left home. When I got there, about three minutes afterwards, I heard Darcas scream.

Re-examined: The defendant had no hat on his head there that night, and he was the only person there I saw without a hat on his head. I was there the whole time defendant was there that night, and he never inquired anything about who committed the murder or who was suspected with it.

Oliver Wilkins, being sworn for the State, testified: I am the husband of Jane Wilkins, the deceased. I last saw her alive on October 15, 1892, about 4 o'clock in the afternoon. From sundown until Aleck Brown came after me to tell me of my wife's death, I was at the white folks' gambling joint at the Home Saloon. John Majors, Warren Flemming, Joe Sims, and others were there. I went out once to go to the market to borrow 50 cents, and at this time also went to the negro joint, and was gone not over ten minutes. I went out only one other time, to go to the saloon, a few feet from the white folks' joint, to get a drink of whisky, and returned as soon as I got the drink.

Cross-examined: When Aleck Brown came in, he said, "Oliver, somebody has killed your wife with your own axe." I think I got to the house in about fifteen minutes before Aleck got there. When I got there, I said, "Ain't it a pity my poor wife is here, dead?" I got my gun, but there was no load in it, and it wouldn't shoot anyhow, for the breech pin was out. I kept my axe under the house, with the handle lying straight with the side of the house. You could not see it without stooping down.

Re-examined: I was not at home any time that night between sundown and the time I was informed of the death of my wife. I gave Mary Brown, daughter of defendant, a squirrel on the day of the death of my wife. The squirrel was dressed and cleaned on the day I gave it to her.

George Davis, being sworn, for the State, testified: I am sheriff of Bastrop County. I examined the hat and shoes and clothes referred to by the witness J. F. Nash, and saw the spots of blood on them. I examined the hat and shoes and pants the next morning after the murder. The blood was fresh, red blood.

H. N. Bell, being sworn, for the State, testified: I examined the spots of blood on the hat and pants and shoes of the defendant on the morning after the murder, and the blood was red and fresh.

Pearson Hill, being sworn, for the State, testified: A few minutes before 9 on the night Jane Wilkins was killed, I met Aleck Brown at Dally Nunn's corner, which is the northeast corner of the block north of Oliver

Wilkins' house. I said, "Halloo, old boy! Where are you going?" He said, "I am only walking around." We talked a short time about the supper, and about the folks passing up town, when I told him I must be going, and bid him good night.

Cross-examined: He had a white straw hat in his hand when I met him. I think he had on an old pair of rickety-looking brown jeans pants. Where I met him was northeast of Oliver Wilkins', and Aleck lives southwest from Oliver's. Aleck said he believed he wanted to go up town. I told him not to go up there; the negroes were fussing in that joint, and some one had to go to hell out of that hole, and he had better keep away. I said, "I must be going. I promised my wife to be home early to-night. If I don't go, I will have a fuss on my hands." Aleck laughed, and said, "Yes, that's so. We do sometimes get those on our hands when we go home late." When I bid him good night, Aleck went west, and I went east. Immediately after I left defendant, and went about 100 yards, and crossed the railroad, the town clock struck 9. When I first saw defendant, he was coming from between two seed houses on the railway reservation, near Dally Nunn's corner.

Dally Nunn, being sworn, for the State, testified: I live northeast from Oliver Wilkins' house. On the night Jane Wilkins was killed, I heard Pearson Hill and Aleck Brown on the north side of my house, talking. It was about 9 o'clock. About an hour afterwards I heard Aunt Darcas scream.

Ann Sims, being sworn, for the State, testified: In the spring of 1892 I went to Aunt Jane Wilkins' house. Aleck Brown, the defendant, was there, and she and Aleck were quarrelling and fussing, and Aleck called her a damned bitch. Aleck was cursing, and Jane was hallooing. At another time after this I was passing by Wilkins' house, and heard defendant and deceased quarrelling, and I heard the deceased say, "I will not do it;" and the defendant then said to the deceased that he would kill her. He said, "Nigger, I will show you. I will kill you." This was at night, and there was no one there except defendant and deceased. I have heard Aleck Brown curse Oliver Wilkins, too.

Tishie Kerr, having been sworn, for the State, testified: About 9:30 o'clock on the night that Jane Wilkins was killed, I heard four or five licks struck, and heard Jane scream. The licks sounded like some one cutting wood. There wasn't five seconds between the licks. I live at John Kerr's. The licks sounded like they were at Wilkins' house, and I recognized deceased's voice, in a scream, following immediately after I heard the first blow, and heard the scream only one time. The voice was a scream as if in distress.

Ben Holiday, being sworn, for the State, testified: I live south of Oliver Wilkins' about 50 or 60 yards. On the night of October 15, 1892, I went to town at the first of dark, and came back in about twenty min-

utes. When I came back, Aleck Brown, the defendant, was talking with Jane Wilkins, the deceased. He was standing on the outside and she was on the inside of the yard fence of Oliver Wilkins' place. My little boys, who had gone up to the Taylor House, got home about half an hour, or maybe three-quarters of an hour, after I got back from town. I live on the most direct route from defendant's house to Oliver Wilkins', and in going to the Taylor House, by the most direct route, from my place, you would have to pass Oliver Wilkins' place. Maria Gage lives about one-quarter of a mile southeast from where I live; and at the time of the death of Jane Wilkins, Maria Gage owed me a dollar, which she promised to pay on that day, but did not pay on that day. My house is very near the sidewalk, and on the night of the murder there was a lamp burning with a full light until a few minutes before I heard Aunt Darcas screaming, when she found her daughter dead. There is one door and one window of the house on the west side of the room the lamp was in that night.

Lloyd Holiday, being sworn, for the State, testified: About two or three hours after dark on the night of the murder of Jane Wilkins, I and my brother left to go to the Taylor House, and on our return came back by Jane Wilkins' house. The defendant, Aleck Brown, was there by the fence, talking to her. They said "Yes" about something. I was gone about half an hour. She was inside of the yard fence, and he was on the outside. They were near the gate, on the west side of the house.

Ann Morrison, being sworn, for the State, testified: I live on the opposite side of the street from Oliver Wilkins'. The street is about thirteen yards wide. Oliver's house is about ten feet from the street, on the south side, and mine about the same distance, on the north side. Oliver's house fronts south, and mine east. On the night of the murder, about 8 o'clock, or after, I saw Aleck Brown standing on the outside of Oliver's yard fence of Oliver's house, at or near the northwest corner. Jane Wilkins, the deceased, was standing on the inside, and they were talking to each other. They were close together, and one each side of the fence. They were quarrelling, I don't know what about. They stood there quarrelling for several minutes. I heard him say something about money, and I heard Jane say she was through with him, and would have nothing more to do with him. She left, and immediately went in the house, and defendant immediately opened the gate, and went in, and left the gate open. He followed Jane immediately into the house. I heard some noise in Jane's house. It sounded like some persons fussing and quarrelling. This rumpus was kept up several minutes, and I could not tell what was said by the persons fussing and quarrelling. I went out to my yard fence, and I could tell then that the parties were outside, and south of the house, fussing and quarrelling. I heard Jane say, "You're a liar." Then I heard the defendant, Aleck Brown, say something in

answer, but could not tell what it was.   Then I heard about four licks struck, and heard Jane scream after the first lick was struck, but heard her voice no more after I heard the second blow.   After I heard the blows, and heard Jane scream, I saw some one run and jump over the fence right south of the gate, and run down by Ben Holiday's, in the direction of his house.   I heard a plank of the fence break as he got over the fence.

I have seen the defendant there frequently, both day and night, while Oliver Wilkins was not at home.   I heard her say, "You're a liar." Then I heard him say something, and then she said, "It's a lie," and he said something else, and she said again, "You're a liar."   I went in the house while they were standing at the fence.   I stayed a little while, and when I came out I could hear them in the house talking, quarrelling, and sounded like they might be fighting, and I recognized it as Aleck's voice. They kept this up until I went in the house again.   I stayed a few minutes, and when I came out they were out in the yard.   I could hear them quarrelling and talking in the yard.   I could not understand all the defendant said.   He talked low, but I could understand Jane.   She called him a liar three times.   I went back in my house the third time.   Not long after I went in I heard the blows struck, and the screaming of deceased; and then I heard some one run across the yard, and saw him jump over the fence, and heard the fence break as he got over.  ˙ I could not tell how he was dressed.   I then went in my house, and stayed about half an hour, I think, and then I called Jane, but she did not answer.   I then went and called Aunt Darcas, her mother, and she came, and found Jane dead, with her head split to pieces, with a bloody axe by her side.   The defendant and deceased had had quarrels before, and at one time he bit one of her fingers nearly off.   I have known the defendant, Aleck Brown, ever since he was a baby.   (And the witness points him out, and identifies him in open court, before the jury, and says she is positive he is the man who was engaged in the conversation and quarrelling with the deceased on the night of the murder.)   I heard the conversation, and recognized his voice.   This all occurred in the town and county of Bastrop, in the State of Texas, on or about October 15, 1892.

Jo Sims, being sworn, for the State, testified:   I know where Oliver Wilkins was on the 15th of October, 1892, from 6 o'clock p. m. until Aleck came to tell him of the death of his wife.   He was in the gambling house, a few feet in the rear of the Home Saloon, from 6 o'clock p. m. on said day until I left the gambling house.   I left the saloon about 8 o'clock, and when I returned, Oliver was gone to the scene of the killing.

Step Smith, being sworn, for the State, testified:   Oliver came to the gambling joint, near the Home Saloon, at 6 p. m. the night Jane was killed, and never left there at all during the time until Aleck came after him, except once to go into the saloon, a few feet distant, to get him a

drink. He went to the saloon, got his drink, and immediately returned to the gambling house, and remained there.

Warren Fleming, being sworn, for the State, testified: Oliver Wilkins was at the white joint, in the rear of the Home Saloon, on the night of the killing of Jane Wilkins, from a little after 6 o'clock until defendant came after him. He left only one time during that time to go into the saloon, a few feet distant, to get him a drink, and was gone five or ten minutes—can't be certain—and returned and remained there until defendant came after him.

John Majors, being sworn, for the State, testified: Oliver Wilkins, on the night of the killing of Jane Wilkins, came to the joint in the rear of the Home Saloon, and stayed there from about 6 o'clock p. m. until the defendant came and told him of the death of Jane Wilkins. He was gone only once during said time, and then went into a saloon, a few feet away, to get a drink, and immediately returned. Oliver was betting, and I was dealing. Oliver was gone after the drink about five minutes—not over ten minutes, if that.

Cross-examined: I was busy with my game. I did not pay much attention to the time, but it did not seem to me more than ten minutes. He had money when he came back, and went to betting on the game.

Josh Gage, being sworn, for the State, testified: On the night Jane Wilkins was killed, my mother sent me down to Ben Holiday's to tell him, if he would come up to our house she would pay him that dollar she owed him. When I got nearly to Ben Holiday's house, I saw defendant, Aleck Brown, running towards me from the direction of Oliver Wilkins' house. He ran up in reach of me, and I saw it was Aleck Brown. He sorter circled around a light made by a lamp in Ben Holiday's house, as if trying to shun the light, and went towards his home in a sort of trot. I got scared, and ran back towards the Macedonian Church, where my mother was. I didn't stop running until I got to the Macedonian Church. Aleck was running fast until he passed me, and after passing me he ran, in a sort of a trot, off in the direction of his home, near there. He was in the street between Ben Holiday's house and Jane Wilkins' house, coming from the direction of Jane Wilkins' house, when I first saw him; and I got scared so badly when I saw Aleck running that I immediately turned and ran back to my mother, without seeing Ben Holiday. I am between 14 and 15 years of age, and Maria Gage is my mother. I have known the defendant, Aleck Brown, all my life, and am positively certain the man I saw running that night, as I have stated, was the defendant, Aleck Brown. (And the witness points, and identifies the defendant in court as the man he saw running, as testified by him.)

Cross-examined: I have talked about seeing Aleck that night with Uncle Oliver Wilkins. I didn't tell him what I was going to say. I

don't know why I wasn't asked to testify at the examining trial. I know Aleck Brown well, and one reason I got scared was because his shirt was unbuttoned, and he ran up so close to me I could have put my hand on him. As soon as I saw my mother, upon my return, I told her about my seeing Aleck Brown running, and about my getting scared, and failing to deliver her message to Ben Holiday.

Maria Gage, being sworn, for the State, testified: I am the mother of Joseph Gage, and he is 14 years old. I sent him to Ben Holiday's on the night Jane was killed. Joseph left just after dark. He was gone about one-quarter of an hour, and had been back about half an hour when we heard Aunt Darcas screaming that Jane was killed. I was owing Ben Holiday $1, and had promised to send it to him on that day, but a check for my money had been lost, so I could not get my money that day, and I sent my son Josh to Ben Holiday's that night to tell him I would get the money and pay him the next day. It was about 9 o'clock, I suppose, when I started him to Ben Holiday's, and in about fifteen minutes he came running back, and said that he did not see Ben Holiday; that when he got to Ben Holiday's house he met Aleck Brown, the defendant, running by Holiday's house; and that this frightened him so that he turned, and returned in a run, without seeing Ben Holiday. About one-half an hour or more after Josh returned, and told me this, I heard Darcas Gage screaming out that her child had been murdered. I live near Colonel Jones'. It is almost a mile from Colonel Jones' to the place where Jane was killed.

Here the State closed.

Caddy Brown, being sworn, for the defendant, testified: I am the wife of Aleck Brown, the defendant. We went to bed about half past 8 on the night Jane was killed. We went to sleep. I heard Aunt Darcas screaming, which waked me up. Aleck was asleep beside me in the bed. I woke him up, and told him to put on his clothes, and run on ahead of me. It was dark when he got up, and I don't know what clothes he put on. We had supper late. It must have been 8 o'clock or after. Aleck might have been knocking about the lot while I was getting supper. I was busy, and didn't pay any attention to him. When I got over to Oliver's, Aunt Darcas threw her arms around me. She told Aleck to go after Oliver.

Mary Brown, being sworn, for the defendant, testified: I am the daughter of Aleck Brown. I was at Jane Wilkins' on October 15, 1892, and left there about 7 o'clock. Uncle Oliver was out hunting that morning, and gave us a squirrel. Papa cut it up and salted it. I took two squirrel tails home with me, and gave them to my little brothers to play with. The last I saw of them they were playing with them around the house.

Cross-examined: The squirrel was dressed by Oliver Wilkins before he gave it to me, and he gave it to me before noon of that day, and I took it in my hand over from Wilkins' house to defendant's.

George Kirk, being sworn, for the State, testified: I took Aleck's sister to the supper that night.

William Matthews, being duly sworn, for the defendant, testified: On the night Jane Wilkins was killed, between 7 and 8 o'clock, I was going south down the railroad track, and at the southeast corner of the block on which Oliver Wilkins, Ben Holiday, and Darcas Gage live I saw the defendant turn the corner of the fence, coming from the direction of his residence, and going up north in the direction of Dally Nunn's corner.

Dr. J. B. Camps, being sworn, for the defendant, testified: I walked from the gambling joint where Oliver Wilkins was on the night Jane Wilkins was killed, to Oliver's residence. I took six minutes to walk there, and six minutes to walk back from there, at a pretty rapid gait.

*Dyer Moore* and *McPhaul & Hood*, for appellant.—1. Acts passed by a special session of the Legislature, which were not designated in the proclamation of the Governor calling such special session as submitted to it by the Governor, are in violation of section 40, article 3, of our Constitution, and are therefore void. By no rule of construction can the Governor's proclamation convening the Twenty-second Legislature in special session, or his message sent to it afterward, be extended to empower the Legislature to pass the act entitled, "An Act to organize and establish the Twenty-first Judicial District, to fix the times of holding courts therein, and to repeal all laws and parts of laws in conflict therewith."

On the 18th day of February, 1892, the Governor of Texas issued his proclamation convening the Twenty-second Legislature in special session. Among other subjects for legislation, the Governor, in his proclamation, designated the following: "To reapportion the State into congressional, senatorial, judicial, and representative districts, and provide for the election of officers therein."

The Twenty-second Legislature having convened in response to the Governor's proclamation, passed an Act entitled, "An Act to organize and establish the Twenty-first Judicial District, to fix the times of holding courts therein, and to repeal all laws in conflict therewith." This Act, together with an Act entitled, "An Act to amend section 2 of an Act to reorganize the Thirty-fifth Judicial," and an Act entitled, "An Act to reorganize the Forty-third, Forty-sixth, and Forty-seventh Judicial Districts," being the only acts passed at said special session having for their object a reapportionment of the State into judicial districts and provide for the election of officers therein.

After the Legislature had convened, the Governor sent to it his message, in which he merely gives his reasons why the legislation reapportioning the State into judicial districts was necessary. Const., art. 3, sec. 40; Governor's Proclamation of date February 18, 1892; Governor's Message of date March 14, 1892; Wells v. Railway, 19 S. W. Rep., 530.

2. Section 65, article 3, of the Constitution, provides: "No bill (except general appropriation bills) shall contain more than one subject, which shall be expressed in its caption." The Act organizing and establishing the Twenty-first Judicial District is in violation of the Constitution; not only because it fails to state in its caption the real subject matter of the bill, but also because the caption misstates the real purpose of such bill, the real purpose of the bill being to transfer Bastrop County from the Twenty-second to the Twenty-first Judicial District. In order to comply with the constitutional requirement, its caption should have so stated.

3. Our Code of Criminal Procedure, article 337, provides, that any person confined in the county jail, shall, upon his request, be brought into court for the purpose of allowing him an opportunity to challenge the grand jury. If it be a fact that defendant was confined in jail in the county, and that he did not know the grand jury which indicted him was being empanelled, the want of such knowledge will excuse him from not making a "request" to be brought into court for that purpose, and the State having failed to deny or controvert the statements made by defendant, the same will be taken as true.

4. It is made certain by defendant's bill of exceptions number 7, that the verdict was returned on the 15th day of January, 1893, which was Sunday. The record failing to show that the judgment on this verdict was entered on Sunday subsequent to its return, it will be presumed that the judgment entry was made immediately in accordance with article 720, Code of Criminal Procedure, and being entered on Sunday, is absolutely void. Sherman v. The State, 1 Texas Cr. App., 215.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

It is contended, that the Act of the special session of the Twenty-second Legislature, organizing the Twenty-first Judicial District, is unconstitutional, because the Governor did not, in his proclamation convening said Legislature, designate this particular matter in said proclamation as a "subject" for legislation.

Article 4, section 8, of the Constitution, provides, that "the Governor may, on extraordinary occasions, convene the Legislature at the seat of Government, or at a different place in case that should be in the possession of the public enemy, or in case of the prevalence of disease thereat. His proclamation shall state specially the purpose for which the Legislature is convened." It is further provided by article 3, section 40, of said Constitution: "When the Legislature shall be convened in special session, there shall be no legislation upon any subject other than those

designated by the proclamation of the Governor calling such session, or presented to them by the Governor; and no such session shall be of longer duration than thirty days."

The proclamation, among other things, convened the Legislature " to reapportion the State into congressional, senatorial, judicial, and representative districts, and to provide for the election of officers therein." The judicial districts mentioned in the proclamation were those presided over by the district judges. A casual inspection of the proclamation renders this certain. That the authority to reapportion or reorganize the judicial districts of the entire State necessarily carried with it the power to reapportion any given number of such districts, is to our minds a self-evident proposition. The office of the proclamation is to designate the subjects, and not the manner or extent of legislation on such subjects. " It was not the intention to require the Governor to define with precision as to detail the subjects of legislation, but only in a general way by his call to confine the business to the particular subjects." Mitchell v. Turnpike Co., 3 Humph., 455; Devereaux v. City of Brownsville, 29 Fed. Rep., 742; Baldwin v. The State, 21 Texas Cr. App., 591.

1. That the Legislature may only enact legislation in part in relation to the subject mentioned in the call does not render such legislation invalid, nor is it necessary to the validity of such legislation that the whole subject matter should be acted on by the Legislature. The call includes the entire subject of reapportioning the judicial districts, and authorized " any and all such legislation upon that subject as was deemed necessary by the Legislature. It was not necessary, nor would it have been proper, for the Governor, in his proclamation, to have suggested, in detail, the legislation desired. It was for the Legislature to determine what the legislation should be." Baldwin v. The State, 21 Texas Cr. App., 591.

2. We do not concur in contention of counsel, that the object and purpose of the act are not sufficiently stated in its caption. It was not necessary to state in the caption the different counties constituting the newly constituted district, nor to state that one of the counties composing such district was transferred from some adjoining district. The caption is sufficient, and not violative of article 3, section 35, Constitution.

3. Defendant's motion to set aside and quash the indictment because he was not allowed an opportunity for challenging the array of jurors constituting the grand jury was not well taken. He made no request to be brought from jail for that purpose. This was necessary. Code Crim. Proc., art. 377; Willson's Crim. Stats., secs. 1901, 1902.

4. A continuance was sought in order to have analyzed the blood found upon the defendant's clothing. There was no diligence used to obtain such analysis, and no excuse given for such failure. The murder occurred October 15, and the application for continuance was filed January 14 following. Again, the blood spots were found upon defendant's hat,

pants, shirt, and shoes, and the application alleges that it came from a squirrel he had dressed on the morning preceding the homicide at night. The evidence adduced by himself, as well as by the State, shows that he did not dress the squirrel. He introduced his daughter, who stated that a squirrel had been given her on the morning in question, but that it was dressed before she received it, and she carried it home after it was given her, and the State introduced the witness who made the present, and who also dressed it. The analysis could not have been material, under the facts of this case.

5. When the allegations in a bill of exceptions are contradicted by a statement of the court, annexed to the bill, such statement will be held to correctly present the matter at issue. As thus qualified, the bill disclosed that Oliver Wilkins, husband of deceased, said to defendant, "Aleck, you have killed my wife." Defendant made no reply, and walked off. The admission of this evidence was not error.

6. It was not error to receive and record the verdict on Sunday. Powers v. The State, 23 Texas Cr. App., 42; Walker v. The State, 13 Texas Cr. App., 618; Shearman v. The State, 1 Texas Cr. App., 215.

7. The bill of exceptions recites the reception of the verdict on Sunday, which was the 15th day of the month. The entry of the judgment is shown by the transcript to have been made on the 14th. Because of this variance it does not follow that the judgment was entered on Sunday. If entered on Sunday, it was a fact easy of ascertainment and proof, and should have been shown, if it was desired to set aside the judgment on this ground. We are not authorized to presume, from the variance in the dates stated, that such entry actually occurred on the 15th, or on Sunday. Presumptions are indulged in aid and support of the judgment. The party attacking the judgment must overcome such presumptions. The day set out in record of judgment simply recited the beginning of the trial.

8. The court's omission to instruct the jury in regard to the law of manslaughter was not error. The evidence does not raise that issue.

9. The evidence supports the conviction. In addition to previous quarrels and difficulties between the parties, and threats of the defendant against deceased, the killing, and the manner of its execution, were attended with such circumstances of enormity and cruelty as afford sufficient evidence to warrant the conclusion, that the killing was the result of a sedate, deliberate mind, and formed design, and that it was committed upon express malice. The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.