MARCELLUS THOMAS v. THE STATE.

No. 3166. Decided April 25, 1906.

**1.—Murder in First Degree—Indictment—Challenge to the Array—Grand Jury.**

Upon a trial for murder, a challenge to the array of the grand jury was not well taken, where defendant failed to make a request at the time to be brought from jail into court so as to challenge the array. But he could nevertheless move to quash the indictment on account of race discrimination.

**2.—Same—Race Discrimination—Formation of Grand Jury—Special Venire.**

The rule is, under the decisions of the Supreme Court of the United States, construing the Fourteenth Amendment of the Constitution of the United States, that while a negro charged with crime is not entitled to a negro jury, or to a mixed jury, yet the Constitution guarantees him against any discrimination against the negro race in the selection of a jury by whom he is to be tried.

**3.—Same—Case Stated.**

Where upon trial for murder, the record showed that while no negroes were on the jury commission who were appointed for the selection of grand and petit juries who passed upon defendant's case, but the judge instructed the jury commissioners not to discriminate against the negro race in the selection of jurors; and that the commissioners evidently had this in mind and endeavored to comply with the injunction of the court in this respect; and that it was a matter of difficulty with them to determine on the basis of a pro rata representation as between the whites and negroes, what pro rata of negroes were qualified as jurors. Held, that no discrimination was shown, although no juror of the negro race was drawn on defendant's jury, and although the jury commissioners may not have given the

negro race a full pro rata with the white race in the selection of the grand and petit jurors, as long as they fairly and honestly endeavored to discharge their duty.

**4.—Same—Democrat—Republican—Politics—Primaries.**

Where upon trial for murder upon motion of the defendant to quash the indictment and writ of special venire on the ground of race discrimination, the evidence showed with reference to the Democratic primaries, that the negroes were allowed to vote in the primary election, if they were Democrats, and were not excluded from voting because they were negroes, the same was not material to the issue.

**5.—Same—Continuance—Diligence—Immaterial Testimony.**

Where upon trial for murder the record showed upon appeal that the process for the absent witnesses was returned " not found " and that no other process was applied for there was no diligence. Besides the testimony of the absent witnesses was the same as testified to by defendant and other witnesses, and was not sufficiently material for a reversal of the judgment.

**6.—Same—Dying Declarations—Predicate.**

Where upon trial for murder, the record showed upon appeal that deceased in the morning made some expressions indicating that he expected to get well, but in the afternoon of the same day declared that he was going to die, and did die, about twelve hours thereafter, and that he made his statement when he was conscious of approaching death, the predicate was sufficient to admit his dying declaration.

**7.—Same—Charge of Court—Murder in Second Degree—Unlawful.**

Upon trial for murder where the court had instructed the jury upon malice and implied malice, and then instructed them if they believed defendant shot and killed deceased with implied malice as before defined and explained, to find him guilty of murder in the second degree, it was not necessary to tell the jury that the killing must be unlawful.

**8.—Same—Charge of Court—Manslaughter—Adequate Cause.**

Where upon trial for murder, the evidence did not raise any statutory adequate cause, and the court nevertheless defined adequate cause under the statutes and authorized the jury to consider what occurred at the time, and also all the facts and circumstances bearing on the provocation, etc., there was no error.

**9.—Same—Charge of Court—Cooling Time.**

Where upon trial for murder, the theory of the defense was that the defendant acted in self-defense and that deceased and his companion made two separate attacks upon him some twenty or thirty minutes apart; and according to the State's theory there was no provocation constituting adequate cause; yet if defendant nevertheless shot too hastily and really did not act in self-defense and was excited by what had occurred before, this might be manslaughter; still there was no necessity for the court to have charged on cooling time, as he instructed the jury that they could look to all the facts and circumstances in order, to emphasize or intensify the provocation at the time. Neither was there any error in the court's charge that the provocation must not be given by any person other than the party killed, the court having in another portion of his charge authorized the jury to view the act and conduct of both of said parties, who were acting together as one on both occasions.

**10.—Same—Self-Defense—Charge of Court.**

See opinion for charge of court on self-defense on the appearance of danger from the defendant's standpoint which was held sufficient.

**11.—Same—Evidence—Confession—Charge of Court.**

Where upon trial for murder˙the court instructed the jury not to consider any statement made by defendant unless they found he was first warned, and that the same was voluntarily made, there was no error.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. J. K. P. Gillaspie.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Noah Allen,* for appellant.—On question of charge on manslaughter: McLaughlin v. State, 10 Texas Crim. App., 358. On question of adequate cause: Bracken v. State, 16 S. W. Rep., 192; Griffin v. State, 50 id., 366; Warthan v. State, 55 id., 55. On question of cooling time: Castro v. State, 40 S. W. Rep., 985. On question of self-defense: Hill v. State, 10 Texas Crim. App., 618; Pierce v. State, 21 id., 540; Rosetta Harris v. State, 93 S. W. Rep., 726. On question of race discrimination: Smith v. State, 58 S. W. Rep., 97; Whitney v. State, 59 id., 895; Leach v. State, 2 Texas Ct. Rep., 380; Kipper v. State, id., 411.

*J. E. Yantis,* Assistant Attorney-General; *E. T. Branch* and *Brockman & Karnes,* for State.—On question of dying declaration: King v. State, 34 Texas Crim. Rep., 228.

HENDERSON, JUDGE.—Appellant was convicted of the murder of John Blair, and his punishment assesed at death.

The proof, which was uncontradicted, showed that late on the afternoon of October 9, 1905, John Blair and Shropshire, were in the town of Spring, Harris County, and started to their home, near Wilburton, some five or six miles north of Spring. There is testimony tending to show that they were drinking some, and that they bought some beer in Spring and carried it with them. Both were riding horseback; that they left Spring late in the afternoon, and pursued their journey homeward in a slow gait. When they had gotten about a mile out of the town of Spring, and some four hundred or five hundred yards north of the house of appellant, at a point in the Wilburton road, both men were killed by appellant. Two shots were fired in rapid succession at close range. This was either at nightfall, or directly thereafter.

The State's theory is, that on their journey towards home, as they were riding slowly along the road, and about a half mile from Spring, they were overtaken by appellant, who was also riding horseback. He rode along behind them, and finally one of them asked who he was; and he replied, "Marcellus Thomas." They understood him to say, "Dr. Sellars." One of them replied he was not Dr. Sellars, that he was a negro; and they requested him to ride in advance of them instead of behind them. This enraged appellant, and he rode on in advance of them to his house (which was on the road some four hundred or five hundred yards ahead), procured his shotgun, proceeded up the road, ahead of said parties, and lay in wait for them some three hundred or four hundred yards north of his house, at a point where the timber approached the road, and when Blair and Shropshire approached the point on their horses, he shot both of them, firing two

shots in rapid succession: one at each, which inflicted mortal wounds, and was the cause of the death of both of said parties. Blair was found some two hundred yards from the place where the shooting occurred; and Shropshire was found some four hundred or five hundred yards distant, south, towards Spring. Both were taken to Spring on that night, and medical attention given them. Both died in a day or two after the shooting. Before Blair died he made a dying declaration, which is in accord with the State's theory of the homicide.

Appellant's theory is to the effect that he came from Spring late in the afternoon, and after deceased Blair and Shropshire had left, they preceding him, and having passed Camille Thomas (who lived on the road on the route the parties were traveling), some half an hour before he reached there; that he had an engagement to get a wedge from John Bird, who lived about a mile up the road, in the same direction that said parties were traveling. That after stopping at Camille Thomas' awhile and conversing, he went on up the road to his own house, got his shotgun, and pursued his journey, in order to get said wedge, which he expected to use the next day. That he overtook Blair and Shropshire along the road, and they accosted him, asked him who he was. He told them he was Marcellus Thomas; they understood him to say, "Dr. Sellars," and told him he was a damn lying son of a bitch, and otherwise abused him, and finally took after him and ran him some two hundred and fifty yards down the road. He then succeeded in getting into the timber and eluding them; that he remained in the timber some twenty-five minutes giving them time to get ahead, so that he could proceed after his wedge; that he returned to the road, and in pursuance of his journey came suddenly upon Blair and Shropshire, who had stopped in the road. Blair was off his horse on the ground, and Shropshire was on his horse. They immediately attacked him: Shropshire striking at him, as appellant believed with some weapon, and the other grabbing his bridle reins. Appellant believed that they intended to kill him, and shot the one on the horse first, and then turned his gun on the one who held his bridle reins; that he did not go home that night, but went to Westfield, and stayed all night with a relative, where he was arrested the next morning. This is a sufficient statement of the case in order to discuss the questions raised.

Appellant filed a motion to quash the indictment because he was not given an opportunity to challenge the array of the grand jury, and he also made a motion to quash the indictment on the ground that in the formation of the grand jury, he being a negro, his race was discriminated against in the empanelment of said grand jury. He also filed a motion to quash the special venire, because his race and color was discriminated against in selecting and drawing said special venire.

Under our procedure his motion to quash the indictment on the ground that he was not afforded an opportunity to challenge the array

of the grand jury is not well taken. Appellant was confined in jail at the time the grand jury was empaneled, and he should have made a request at that time to be brought into court so as to challenge the array. If he failed to make such request, he cannot be heard afterwards to complain. Kemp v. State, 11 Texas Crim. App., 174; Brown v. State, 32 Texas Crim. Rep., 119; Barkman v. State, 52 S. W. Rep., 69. But it seems that, notwithstanding his failure to challenge the array, he can still present his motion to quash the indictment, because his race was discriminated against in the formation of the grand jury which returned the bill. See Carter v. State, 39 Texas Crim. Rep., 345, 177 U. S., 442.

Appellant's motions both to quash the indictment on account of race discrimination and to quash the special venire on the same account are in proper form, and under the decisions of the Supreme Court of the United States were made in due time. The court entertained said motions and heard evidence thereon. According to the evidence we gather that the population of Harris County is about 90,000; and of this number, some 70,000 are white, and 20,000 are negroes, or of African descent. There are some 10,000 or 12,000 voters in Harris County, and of these, from 20% to 25% are negroes, that is, from 3,000 to 4,000 negro voters. According to some witnesses, about 25%, and according to others not over 10%, are qualified voters; that is, according to this estimate there are from 300 to 1,000 negroes who are qualified to do jury service in Harris County. Our statutes require that at each term of the court the judge shall appoint three jury commissioners for the selection of grand and petit jurors. It is shown that no persons of the negro race have ever been appointed jury commissioners in Harris County. It is further shown that until within the last four or five years, or until the decision of the Supreme Court of the United States in the Carter case, supra, and Whitney case, from Harris County, that no negro grand jurors or petit jurors were drawn in Harris County. That since then, or within the last four or five years, the jury commissioners appointed by the judge were instructed by him not to discriminate against the negro race in the selection of jurors. The testimony tends to show that as a rule one member of the negro race was drawn for service on the grand jury, and from one to two or three negroes were drawn for service on each week of the petit jury. The method of selecting grand jurors under our law is through the commissioners appointed by the district judge, and is covered by article 378, Code Criminal Procedure. These commissioners select the grand jurors from the body of the county, basing their selection on their knowledge of the men selected. Said grand jurors must be able to read and write, and must be of good moral character; and besides, qualified citizens of the State and of the county, and qualified to vote in said county, and must also be freeholders within the State or householders within the county. From the sixteen selected by the commissioners, twelve are ultimately em-

paneled as a grand jury by the district judge at the convening of each term of the court. As to the special venire, it is drawn from the entire jury for the term, the names being placed in a box and drawn therefrom by the clerk; the number required by the court, when so drawn constitutes the special venire in each case. It is shown that under the plan pursued, one negro was empaneled on the grand jury, which found the bill of indictment against appellant. It is further shown that no negro was drawn on his special venire. There is a good deal of testimony in the record tending to show that negroes as a general rule were not as well qualified to sit on juries as persons of the white race, either lacking in sufficient intelligence or from a want of morals. Besides this, there is a good deal of testimony in the record showing who are exempt from jury service, under article 3142, Revised Civil Statutes. Among these, are all persons over sixty years of age; ministers of the Gospel, engaged in the discharge of their duties; and physicians, attorneys, publishers of newspapers, schoolmasters, druggists, undertakers, etc. From the testimony in regard to these exemptions it would appear that a greater pro rata of negroes are exempt than of the white race.

Two of the jury commissioners were placed on the stand, and we quote from their testimony. Rothwell testified he was a commissioner at said term and remembered of one grand juror being drawn who was a negro; and that they drew one negro petit juror for each week of the term. He was asked why there was but one drawn for each week, and replied, "We had so many to draw from who had never served before, and we had to put at least one negro on according to law; that whenever they came across a negro they thought was a good man, they put him on; that they considered a number of negroes, did not know how many, and agreed to put one on the petit jury. That they considered the matter, and according to law and the way the judge charged them, they put on colored men; that they did not leave any persons off because they were negroes; that as to the white men they knew them to be qualified before they put them on, and that they did not discriminate the white man from the negro as a man; that we only put negroes on whom we knew were qualified and the same with the white men." J. L. Parker testified that he was a jury commissioner; that they drew some negroes; that they considered negroes where they knew them, along with white persons, for jury service; that they tried to get a qualified list of jurors; that he did not know for certain whether or not there was a negro drawn on the grand jury.

We understand the rule to be, under the decisions of the Supreme Court of the United States, construing the Fourteenth Amendment, that while a negro charged with crime is not entitled to a negro jury, or to a mixed jury, yet the Constitution guarantees him against any discrimination against the negro race, in the selection of a jury by whom he is to be tried. Carter v. State, 39 Texas Crim. Rep., 345,

and authorities there referred to. So the question for our consideration is, whether or not under the facts as here presented, there was discrimination against the negro race in the formation of either the grand jury which indicted appellant, or in the selection of the petit jury which tried him. We take it, there is nothing in the machinery —that is the laws of the State of Texas regulating jury trials and the selection of juries, which discriminates between the races. But the contention here is, that in the administration of said laws there was such discrimination. While it appears that no negroes were placed by the judge on the jury commission, yet we do not see in this omission any intentional discrimination on the part of the judge: especially in view of the fact that he instructed these jury commissioners, in the selection of jurors not to discriminate against the negro race. From the testimony of the commissioners it will be seen that in the selection of both the grand and petit juries, they had this in mind, and they endeavored to comply with the injunction of the court in this respect. It will be seen from the record that with them it was a matter of difficulty to determine on the basis of a pro rata representation as between the whites and negroes, what pro rata of negroes were qualified as jurors. While there might be a discrimination against the negroes, even in the adoption of the pro rata, yet we think that is ordinarily a good test. We are not prepared to say that, considering the testimony as to negroes qualified, and the evidence regarding exemptions,—the jury commissioners did not in the selection of both the grand and petit jurors allow the negro race their pro rata of qualified jurors. That is one-twelfth on the grand jury, and about the same per cent. on the petit jury. The fact that no juror of the negro race was drawn on appellant's jury was merely accidental, as those lists are drawn from the jury list for the term of the court which contained from one to three negroes for each week of the term. These were placed in a box along with white jurors, and as it happened none of them were drawn out. Of course, this could not be regarded as a discrimination. It may be that the jury commissioners did not give the negro race a full pro rata with the white race in the selection of the grand and petit jurors in this case, still this would not be evidence of discrimination. If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated. We understand the rule to be that mere error in administering the criminal law of the State, or in the conduct of a criminal trial, no federal right being invaded or denied, is beyond the revisory power of the Supreme Court of the United States under the Constitution and the statutes regulating its jurisdiction. Gibson v. Miss., 162 U. S., 591; Andrews v. Swartz, 156 U. S., 272; Bergemann v. Backer, 157 U. S., 655. So we believe, looking at the record in this case, that the most that can be said is, that while in the selection

of the jury, the negro race may not have been accorded its full pro rata with the white race, this was a mere irregularity; and the evidence does not show that the negro race was intentionally or otherwise discriminated against in the selection of said grand and petit jurors. We accordingly hold there was no error in the action of the district judge in overruling appellant's motions.

In this connection we notice that appellant reserved a bill of exceptions to the action of the court refusing testimony tending to show negroes were excluded from voting in the Democratic primary, and that the Democrats elected the officers of the county, and these were instrumental in operating the machinery of the court, which excluded negroes from serving on juries. The court admitted some testimony on this line, but subsequently rejected further testimony. However, we understand that the proof introduced merely showed that the negroes, if they were Democrats were allowed to vote in the primary, but not otherwise. Negroes were not actually excluded because they were negroes, but because they were Republicans. It does not occur to us that if appellant could have proven what he stated he expected to prove, this testimony could be regarded as material.

Appellant filed a motion for continuance on account of the absence of Anne Thomas and Elijah Robbins. The application shows that Anne Thomas was temporarily residing in Hardin County, and process was issued for her to that county. Robbins was a resident of Harris County, and process was issued for him to said county. We do not believe diligence was sufficient as to either of said witnesses. It appears that the case was called for trial on January 19, 1906. Process was issued for these witnesses on December 13th, preceding. As to the witness Anne Thomas, the return shows that she was not found in Hardin County, but was supposed to be in Beaumont, Jefferson County. The application itself does not show when this return was made; nor does the attached process show. Of course, when said return was made, it was the duty of appellant then to have pursued his diligence and have issued process to Jefferson County. An inspection of the application for continuance shows as to the other witness, Robbins, that return was made on December 20th, and no further diligence was shown as to him. Appellant says he expected to prove by the witness Anne Thomas, that on the evening of the homicide, and before it occurred, she was at the home of Camille Thomas, which was situated near the road, along which deceased and his companions passed that evening, and along which Marcellus Thomas also traveled. According to the State's theory, Marcellus Thomas overtook the parties before they reached said Camille Thomas' house, and the first altercation occurred, after he had overtaken them and before they reached Camille Thomas' house. After this altercation, he left said parties, riding on ahead to his own home, got his gun, then went up the road ahead of deceased and his companion, and lay in wait and slew them. According to appellant's theory, he did not overtake the parties until

after they passed Camille Thomas' house and not until he went from there to his own house and got his gun, and had started up the road after his wedge; that he overtook them for the first time then, and had an altercation with them, in which they assaulted and pursued him some distance. He got out of their way, went into the woods, subsequently returned to the road, still going after his wedge, when he overtook the parties again, and they again attacked him and he slew them in self-defense. Now, it seems that appellant expected to prove by witness Anne Thomas, in accordance with his theory, that the parties (deceased and his companion) passed Camille Thomas' house ahead of him, and some fifteen or twenty minutes before he arrived; and that he did not have any gun at that time; that when said parties passed Camille Thomas they were in a state of intoxication, using loud and boisterous language along the road, and that after said parties passed Camille Thomas' house they had ample time to have gotten beyond Marcellus Thomas' house at the gait they were traveling, and that Marcellus Thomas could not have overtaken them, unless they had dallied along the way. In effect the same facts, it is alleged appellant expected to prove by Elijah Robbins; that is, he lived along the road where the parties traveled on that evening, and he saw Blair and Shropshire pass his house, going from the town of Spring in the direction of their home at Wilburton, along the traveled route; that they were then in a state of intoxication; that subsequent to their passing, Marcellus Thomas came past his house and stopped and talked with him; that he had no gun at that time in his possession; that he left there, stating he was going to John Bird's to get a wedge on that evening to be used early the next morning; and that if said parties (deceased and his companion) had traveled toward their home in the ordinary gait, Marcellus Thomas could not have overtaken them before they passed up the road beyond John Bird's house, or the point where the killing is alleged to have occurred. Appellant proved the same facts in effect by other witnesses besides himself. To our minds it is not a material circumstance whether appellant caught up with deceased and his companion before they reached Robbins' house or Camille Thomas' house, or afterwards. So far as the testimony of the State is concerned, we do not recall that it fixes any particular point along the road where the first meeting of the parties occurred. As stated, we regard it as immaterial whether appellant overtook deceased and his companion before they passed Camille Thomas' house or afterwards; and it is immaterial as to appellant having his gun. The State's theory is that he did not have it when he first overhauled the parties. As to the parties drinking that evening, the testimony of the State shows that they were indulging in intoxicating liquor. None of these witnesses pretend to know anything about what occurred when the parties met at the scene of the homicide. It occurs to us that aside from the want of diligence, and aside from the fact that appellant used a number of witnesses to prove the same

facts, which he expected to prove by the absent witnesses, that this testimony was not of that material character which would cause a reversal.

Appellant complains of the admission of the dying declarations of deceased, John Blair, proved by the witness John Eads. The proposition advanced by appellant is to the effect that the predicate was not sufficiently laid by this witness. It will be seen from an inspection of the record that deceased in the morning made some expressions indicating that he expected to get well, but in the afternoon, between 2 and 3 o'clock, he declared that he was going to die and could not live; and died about twelve hours thereafter. We do not believe the record affords any circumstances indicating that he was not in his right mind. On the contrary it affords evidence that he was. The fact that he did not declare when he was going to die, we think was immaterial under the circumstances. He claimed to be suffering from his wound. He had evidently changed his mind as expressed in the morning as to his condition, and stated he was going to die and could not live. Evidently referring to his then condition and to the fact that the wounds he had received would cause his dissolution. We think, under the circumstances this was a sufficient predicate to indicate that he was then conscious of approaching death under all the circumstances which surrounded him when he made the expression. Connell v. State, 10 Texas Ct. Rep., 890; Sims v. State, 36 Texas Crim. Rep., 154; King v. State, 34 Texas Crim. Rep., 228.

The charge of the court on murder in the second degree is excepted to. The ground of objection to this charge is, that it did not tell the jury that a killing must be unlawful in order to constitute the same murder upon implied malice. We do not agree with this contention. Malice and implied malice had previously been defined by the court; and in this charge the jury were instructed, if they believed appellant shot and killed deceased, with implied malice as before defined and explained, to find him guilty of murder in the second degree.

Appellant also complains of the court's charge on manslaughter, in that the court neglected to charge the jury affirmatively as to what facts would constitute adequate cause. We do not understand that there was any proof of any character of adequate cause as defined by statute. The court was therefore not required to charge on this phase of the case as insisted by appellant. The court defined adequate cause under the statute and authorized the jury to consider what occurred at the time, and also all the facts and circumstances bearing on the provocation, and if from all these facts and circumstances they believed there was adequate cause, etc., and defendant's mind was excited by passion, and he killed on this account, to find him guilty of manslaughter. We think, under the circumstances of this case, the court was not required to instruct the jury further than was done.

In this connection it is also insisted that the court should have instructed the jury on cooling time, inasmuch as the testimony both for

the State and the defendant showed that there were two difficulties or altercations between the parties: one shortly preceding the fatal encounter. According to the State's evidence, this first altercation consisted of insulting words and conduct by deceased and his companion to appellant. They told him he was a negro, and was not the man they understood he purported to be, and requested him to ride ahead. This could not be considered sufficient provocation to constitute adequate cause if the homicide had occurred at that time. According to appellant's theory they attempted to make an attack, he fled, and they pursued him some 250 yards. He further stated at the time of the fatal encounter, they made a second attack on him, and were assaulting him, as he believed, with deadly weapons, and that he slew them in self-defense. Suppose that he shot too hastily, and he really did not act in self-defense, but was excited by what had occurred before, and their attitude then this might be manslaughter; and yet we see no necessity for the court to have charged on cooling time, or to have defined cooling time, on the question of manslaughter. The jury were instructed in accordance with the statute, that the provocation must occur at the time, but that they could look to all the facts and circumstances in order to emphasize or intensify the provocation at the time; and of course, under this they were authorized, if they believed appellant's statement, to look back to the preceding transaction. We understand that the charge of the court fully authorized them to do this. The court distinctly told the jury to consider all of the facts and circumstances in evidence: the threats, if any, past conduct and bearing of the parties, and all the facts and circumstances transpiring before, at the time of and after the homicide in determining the condition of defendant's mind at the time of the alleged killing, and the adequacy of the cause, if any, producing such condition. This instruction, of course, comprehended all that had transpired between the parties, on that fatal evening. Appellant's defense of manslaughter was predicated upon his own testimony and the evidence of provocation at the time, testified to by him. The court told the jury that they could consider this, and in that connection, all of the other facts transpiring between the parties before that. We think that this was sufficient. We do not believe that Brownlee v. State, 13 Texas Ct. Rep., 621, is in point. Some four or five minutes after the altercation, according to the testimony of Brownlee, he renewed the difficulty, and struck deceased with a knife. But here, according to the only testimony of defendant (which was his own) the other parties renewed the difficulty, and gave him the right to act in self-defense. But, as stated, if the jury did not believe this phase of the case, they might regard it as a provocation, and then, according to the court's charge, they could view this provocation in the light of all the facts and circumstances that had transpired before this, which included the alleged altercation and pursuit of appellant by deceased some twenty-five or thirty minutes previously. Appellant

urges the further criticism of said charge, that it limited the provocation to the acts of deceased, John Blair, and did not embrace his companion, Shropshire. We do not believe this is well taken. The charge in defining manslaughter tells the jury that the provocation must not be given by any person other than the party killed. However, the charge in applying the law to the facts authorized them to view the acts and conduct of both of said parties. We do not believe that the jury were misled by this. Byrd v. State, 47 S. W. Rep., 721 is not in point. The facts are different. There the court charged distinctly as to an assault made by Alexander himself, omitting any assault by Alexander's wife. Here the court, in applying the law to the facts does not confine appellant's rights to an assault by deceased alone, but authorized the jury to view all the facts and circumstances in evidence at the time and before. Here, according to appellant's testimony, the parties were acting together, and as one on both occasions. If appellant's theory be correct, both of said parties were assaulting him at the very time of the homicide; and we do not believe that the jury could have been misled by that portion of the instruction which, in defining manslaughter told them that the provocation must be by the person killed.

As stated before, we do not believe it was necessary for the court to group the facts, or tell the jury, further than was done, what constituted adequate cause. The fact that the court had previously told the jury that an assault and battery so slight as to show no intention of inflicting pain or injury would not be adequate cause, did not require the court on the other hand, to go further and state what character of facts would constitute adequate cause.

We think the court's charge on self-defense was in accordance with the law on this subject. It distinctly instructed the jury on the basis of danger or appearances of danger from the defendant's standpoint. It further told them that if from the attack of deceased and his companion, one or both of them, defendant reasonably believed he was in actual or apparent danger, he would not be bound to retreat to avoid the necessity of killing his antagonist, and that he had the right to act on the demonstrations of either or both of them. We think that the charge on self-defense fairly considered was adequate, and covered every phase of the case as presented by the testimony in that regard.

The court further instructed the jury not to consider any statement made to J. L. Townsend by appellant, unless the jury should find that he was first warned, and that the same was voluntarily made. This charge properly called the attention of the jury to the matter of appellant's alleged confession and left the consideration of that matter with the jury as they should find the facts.

We have examined the record carefully, and in our opinion it contains no reversible error. We further believe that the testimony was

sufficient to authorize the jury to find the verdict which they did. The judgment is affirmed.

*Affirmed.*