## G. C. KING v. THE STATE.

### No. 681.    Decided March 16.

1. **Continuance.**—An application for continuance is always properly refused in either of the following cases: Where the proposed testimony is immaterial; where it is not probably true; where the witness is an unpardoned ex-convict; or where, as to an absent witness, it is not disclosed what defendant expected to prove by him.

2. **Witness Under the Rule.**—On a trial for murder, where "the rule" had been invoked, and after two witnesses had been examined, a third witness came into the court room, who had not been placed under the rule, and who had not heard the testimony of the two witnesses who had been examined, and over objection of defendant, this latter witness was sworn and testified, *Held*, no abuse of discretion on the part of the court in permitting him to testify is made to appear.

3. **Evidence—Dying Declarations.**—On a trial for murder, where it is shown, that from the time he was shot deceased had stated to a number of persons that he was fatally shot, was bound to die, and at no time did he express a hope of recovery, *Held*, that a statement made by him afterwards to a witness was not inadmissible as dying declarations because he had not stated to this particular witness that he was conscious of approaching death.

4. **Same—Dying Declarations and Res Gestæ.**—On a trial for murder, where it appeared that the shots which caused the death were heard by a party some half-mile distant, who immediately ran back on a railroad engine to the scene of the shooting, and upon reaching there found deceased struggling and suffering intense pain from a gun-shot in the back, which penetrated his bowels, *Held*, that the declarations and statements then made to said party by the deceased as to the circumstances attending the shooting, and the person who did it, were admissible in evidence both as dying declarations and parts of the res gestæ.

5. **Murder—Circumstantial Evidence Sufficient, When.**—On a trial for murder, the evidence, though circumstantial, is amply sufficient to support a conviction whenever it establishes to a moral certainty, and to the exclusion of every reasonable hypothesis consistent with defendant's innocence, that defendant, and he alone, was guilty of the crime.

APPEAL from the District Court of Cherokee.    Tried below before Hon. JAMES T. POLLEY.

This is an appeal from a conviction for murder of the first degree, with the punishment assessed at death.

The evidence which brought about the conviction of appellant is entirely circumstantial in character.    It is quite voluminous, thirty-two witnesses having been examined as to the different facts going to make up the chain of facts, which is characterized in the opinion below as "a chain of circumstances pointing to him (defendant) as the guilty perpetrator of one of the most diabolical and cold-blooded murders that has ever stained the annals of the State."    And again the court say: "The State was enabled to bring to bear an array of facts establishing to a moral certainty, and excluding every reasonable hypothesis consistent with defendant's innocence, that the defendant, and he alone, was guilty of this crime."

The circumstances immediately attendant upon the shooting are stated in the testimony of J. L. Bailey, who also testified to the res gestæ and dying declarations of deceased, as follows: "I live at

Wells, in Cherokee County; do a general merchandise business there. Was in Wells on Saturday evening, August 18, 1894. Saw the passenger train as it came in from Tyler that evening. It arrived at Wells at 7:03 o'clock p. m., and took its departure for Lufkin in about a minute after its arrival. I saw Dr. Drewry that evening, immediately as the passenger train pulled out for Lufkin. He was walking over towards the State railroad engine, which was on the State railroad track, a spur leading out from Wells to the coaling camp, a total length of about three miles. The coaling camp is a distance of about three miles south of Wells. At the time that Dr. Drewry went to the State engine that evening there were two convict trusties on it. The doctor got on the engine, and they started down the track toward the coaling camp. In a very short time I heard some four shots fired by a pistol. I am familiar with the firing of guns and the firing of pistols. The shots I heard were down the State railroad track towards the coaling camp, some quarter of a mile or 500 yards from Wells. They were pistol shots, and just four in number. While the shots were being fired, the State engine was running back to Wells. On the arrival of the engine the alarm was given, and we sent about 140 yards to a house for a Winchester gun, and took pistols. Mr. Gus Lang, Ed Lang, his son, and I got on the engine, and with the two convicts went down the track in the direction of the shots we had heard fired. In about 400 yards of Wells, and within fifty or sixty yards of where some railroad ties were across the railroad track, we saw a man some thirty or forty feet away. When our engine stopped, we hailed him, and he told us who it was. He was Dr. Drewry. We went at once to him, Ed Lang getting to him first, Dr. Drewry falling in his arms. This was five or ten minutes after the shooting. Dr. Drewry was the only person we saw; no one else was there. He seemed to be trying to get back to Wells. He was holding his stomach with both hands, and was suffering greatly. The first thing he said when we got to him was, 'I am shot and killed.' We put him on the engine and carried him back to Wells as quick as we could. He talked from the time we got to him until we got him to Wells; he was entirely rational. He voluntarily told me about the shooting. I asked questions without suggesting the reply. He told me that some one came out of the woods from the west side of the railroad track and threw something, he couldn't tell what, across the track. The engineer reversed the engine on seeing this, and as it slowed up he (Drewry) and the fireman got off to go and remove the obstruction from the track, when the man ran up to him (Drewry) and said, 'Hands up! I want your money.' The man approached him with a large new pistol pointed at him (Drewry), and he (Drewry) raised his hands straight up. The man kept telling him he wanted his money, and kept advancing on him and firing at him with the pistol. He said the man shot twice at him, and believing that he would be both killed and robbed if he stood there, he (Drewry) turned to run, and

as he turned the man shot him in the back with the pistol, and he fell instantly, when the man came up to him and asked him his name. He replied that it was A. F. Drewry, and that he was a dentist. The man replied to this, saying, 'Well, all right; God damn you, I have got you, anyhow.' The man then took all his money—$20—five silver dollars and three five-dollar bills. One of the five-dollar bills, deceased stated, had one corner torn square off. He also took his gold-filled watch, chain, and charm, and left, going in a westerly direction, going in the same direction he came from, firing one shot at Drewry as he went off. Dr. Drewry told me that the two convicts ran off, one on the engine and the other on foot, towards Wells. He said the man who shot him and robbed him had on a false beard, and was about his (Drewry's) size, and wore a frock or long coat; his hair was light, and he had on rather dark clothes, though not black. Dr. Drewry would talk a short while about how he was shot, and would then tell me that he was bound to die; that he had no hope of recovery; that his wound was necessarily fatal; that he would leave a large and entirely helpless family, and would then go on telling the circumstances of the shooting. He told me he was not armed at the time of the shooting; had no firearms at all; that he had left Rusk that evening to visit the coaling camp to do professional, or dentistry work. I went to the place of the shooting the following (Sunday) morning. The shooting took place on Saturday evening, about dusk, the 18th day of August, A. D. 1894, in Cherokee County, Texas, in three or four hundred yards of the Angelina County line. I saw the two railroad ties by the railroad track, and saw and carefully inspected the man's tracks at the ties. There was but one man's track at this place. The track was made with a number 7 or 8 shoe, and was a most peculiar track; the person making the track at the ties seemed to press most of his weight on the heels of his shoes. I saw this same track at, in, and around an 'ambush,' or 'blind,' which was in the bushes by a large oak tree, seventy or eighty yards west of the ties by the railroad track. I saw no other person's track there. This same man's track led from the railroad ties to the ambush, and also from the ambush in a westerly direction through the woods. The ambush was only a few days old, and was constructed of green bushes and leaves. I went back to the scene of the shooting, Sunday evening, in company with John B. Reagan, sheriff of Cherokee County; E. T. Dorough, deputy sheriff; Q. O. Spinks, and others. They found the same track at the ties and in the ambush, and followed it out in the woods several hundred yards, when Mr. Spinks took us through the woods some distance, about a mile, to a road crossing, where they found the same person's track. I carefully noticed the tracks, and followed the tracks that Mr. Spinks showed us through the Spinks field to the Tyler Southeastern Railroad track, and up the railroad track several miles, and I say that the very same shoe made these tracks and those in and around the ambush, and I am morally certain that it was the same

person wearing the same shoe that made all these tracks. After the man got to the Tyler Southeastern Railroad track he traveled in the direction of Rusk, Jacksonville, and Tyler, rather in a northerly direction. In the Spinks field two other tracks were along a part of the way besides this track we were following, and we had no trouble in distinguishing it from the others. The other tracks mentioned led up to Mr. Spinks' house. I saw this same track only once after that Sunday. It was made by a pair of shoes brought to the town of Wells by John B. Reagan, sheriff, a few days after the shooting of Dr. Drewry. [A pair of shoes that were subsequently identified by this witness, Reagan, Dorough, and John W. McCord as the shoes worn by and taken off defendant G. C. King at the time of his arrest and incarceration, on the 20th of August, 1894, were handed this witness, and he identified them as the same shoes brought to Wells by Sheriff Reagan, and the shoes that made the track he refers to.] Sheriff Reagan brought this pair of shoes to Wells to be measured in the tracks at the ties and in the ambush, but a heavy rain had just fallen, and the tracks at the ties and in the ambush had been washed out and obliterated to such an extent that the measure could not be made. The person that we tracked sometimes ran and sometimes walked, as we could tell from the length of the steps. He was running immediately on leaving the ambush, and went west through the woods. In the first conversation had with me, deceased told me that his assailant came from out the woods on the west side of the railroad track, and after shooting him and taking his money, watch, chain, and charm, went off on the west side of the railroad track into the woods. When the first two shots were fired, deceased stated that he was standing with his hands up, facing his assailant. These shots were fired in the direction of the deceased by the assailant. Neither of these shots took effect. Deceased turned to run, and his assailant shot the third time, striking deceased in the back, who immediately fell to the ground and begged his assailant to shoot no more, telling him that he had already killed him. His assailant cursed him, took his money, watch, chain, and charm, and left, going west, and fired one shot at deceased as he went off. The weapon used was a large new pistol."

N. T. Strain testified, that he was the sergeant of the convict guard at the coaling camp, on the 18th of August, 1894; that he knew the defendant, who had worked with him at said coaling camp four of five years, and part of the time as brakeman on the State railroad; that defendant knew the country thoroughly along this line of railway; that defendant also knew that the State financial agent was in the habit of coming each month to the coaling camp, between the 15th and the 20th of the month, to pay off the employes at said camp, and that he generally brought with him for that purpose some $1200 or $1500. This witness testified, that defendant left his employment about the 15th of March, 1894, and that at no time while he was in

his employ, nor at the time he left the same, did the defendant own a watch. Early on Sunday morning this witness went to the place of the shooting, which was about 500 yards from the town of Wells. He found at this place two railroad ties lying beside the track, and about eighty or ninety yards west of these ties a blind, or ambush, had been put up. This ambush was made by a standing oak tree of green brush leaves and poles cut with a knife. The leaves on the bushes which made the ambush were just beginning to wither; showing that the ambush had been constructed for two or three days. The ambush was so constructed as to prevent persons on the railroad right of way seeing in it, and to protect a person in it from rain and sunshine. This witness describes a peculiar man's track which he found at the ambush, and that he had seen the same track where the ties were found by the railroad. He found a cartridge shell near the railway track, which was for a 45-caliber pistol. He also found a bottle of mucilage in the woods a short way from the place of shooting; and at this point he also saw this peculiar man's track which they had seen at the place of shooting and at the ambush. They commenced trailing this track further, and about 100 yards from the place of shooting they found in the woods a false beard and mustache. This false beard and mustache had mucilage upon the lining of the same, and the mucilage bottle which they picked up had in the stopper to the mouth two or three hairs similar to those of the false beard. They had previously picked up near where the ties were found at the railway track a shoe strap which had been torn from the shoe; it was of a very peculiar make.

J. W. Story testified, that defendant came to his house on March 17, 1894, and introduced himself as James A. Johnson, and went by that name as long as he staid on his farm. That during the time he was in his employ defendant slept in a small house in the yard, and he saw a large new pistol in defendant's room hanging up near the door in a scabbard—a 45 Colt's single-action, center-fire, six-shooter. Defendant told witness that he got the pistol and scabbard from Montgomery, Ward & Co., of Chicago, with some other articles, which cost him about $15. Witness also saw defendant in possession of a bottle of mucilage at his house about a week before he left. Defendant left his house at noon on Tuesday, the 14th day of August, 1894, and at that time he had a small black valise, which he carried with him.

Isaiah Thomas testified, that he was employed by and worked for J. W. Story at the time defendant, who called himself James A. Johnson, did; that defendant left Story's on the 14th of August; that about three weeks before he left, defendant showed witness a false beard, whiskers, and mustache which he had, and asked witness if he could tell him what would make them stick on his face. The false beard picked up by Strain in the woods near the place of the shooting, witness thinks, is the same.

E. T. Dorough testified, that he was deputy sheriff of Cherokee County, in August, 1894; that he went with Sheriff Reagan to Wells,

on Sunday, August 19, 1894. When they arrived at Wells they went down the State railroad about a quarter of a mile, to where two railroad ties were lying beside the railroad track. There was a man's track made with a number 7 or 8 shoe at the ties. [This witness substantially corroborated the testimony of Reagan, Bailey, Strain, and Spinks as to the location of the ties, the ambush, the size and peculiarity of the man's track in, at, and around the ambush at the ties, and was positive there was but one man's track, and it was the peculiar track as described.] Witness and Reagan followed the track four or five miles north of the Comer tank, up the Tyler Southeastern road, and flagged the passenger train Monday morning and got aboard it. Reagan got off the train at New Birmingham, and witness went on and had arranged with the engineer and fireman on the engine to signal him to any suspicious character that might be seen along the way. On getting to Dial's Switch, about half way between Rusk and Jacksonville, witness received a signal from the engineer, and got up to cross the car to look as the signal indicated, and as he crossed the car the defendant, G. C. King [whom witness pointed out in court], got aboard the train and came into the car that witness was in. D. M. Holsomback also got aboard the train. Defendant had a small black valise. Witness identified the valise in court as the one defendant had. Had a sack coat on his arm, the one defendant had on at the trial; defendant's shirt was soiled and looked dark, and was open in the back; his pants were wet, and he wore a celuloid white collar. He sat down near the front of the car. There was a vacant seat facing him. Witness went up and took that empty seat, and began a conversation with defendant, and asked him where he was from. He replied, that he was just from a sawmill two miles this side of Lufkin, where he had been at work four or five weeks. Witness then asked him whose mill it was, and he said he did not know. Witness laughed, and replied, "That's funny. You have worked four or five weeks at a sawmill and don't know whose mill it is." He then said he had been at work at Jones' mill. "I asked him where he came from to the Jones mill, and he said he came from the lower country. I asked him how he came to be walking, and he said that he didn't have much money, and that he had traveled a part of the way on the train. I asked him where he got off the train, and he said, 'a little station below here.' I asked him if it was Wells, and he said no, it was Alto, and that he was going to Tyler. I told him there was some trouble down below here the other evening, and I was on the lookout. He said he had heard nothing of any trouble at all. I asked him if he would object to being searched, and he replied, 'Not at all; I have a gun.' He put his hand in his breast on his pistol, and I caught it and took the pistol and handed it to Mr. E. H. Lowe, who began examining it. It was a Colt's improved 45-caliber, single-action, center-fire six-shooter. All the chambers had cartridges in them; four of the chambers had been recently discharged. I continued to search the defendant, G. C. King,

and found in his coat pocket my double hands full of 45-caliber cartridges. I compared these cartridges with those taken from his pistol and the cartridges picked up at the place of the shooting, and they were just the same cartridges precisely. I found a pocketbook with $8.60 in it—eight silver dollars and sixty cents in change    Defendant said that was all the money he had. I asked the defendant, 'What time is it?' He said he didn't know, and had no timepiece. I told him that I felt a watch, but he insisted that I felt more cartridges. I put my hands down in his pants and went to pulling for the watch, when defendant said, 'If you must have it, I will get it out for you,' and defendant put his hands back of him and took the chain loose from the string of his drawers, and pulled the chain, watch, and charm out. The watch was between his legs. I handed the watch to Mr. Lowe, saying to him, 'Here it is. I recognize that chain and charm, beyond a doubt.' The defendant said, 'No; I bought that watch and chain three years ago, and have owned them ever since.' I did not arrest the defendant until we got to Jacksonville, but he kept talking to me about me arresting him, saying to me several times, 'You can't arrest me for carrying a gun;' and I would tell him, 'No; I would not arrest you for carrying your gun; you have a perfect right to do that.' On arriving at Jacksonville I arrested him and took him up to the law office of Captain W. E. Donley, and there Mr. J. C. Brady, a deputy sheriff who resides at Jacksonville, and I searched his valise. In it was a novel, 'The Private Detective,' and in the pages of that novel were three five-dollar bills, one bill in a place. One of the bills had the corner torn square off. [A small roll of greenback money was handed witness, and he identified it as the same bills found in the defendant's valise.] The defendant made no explanation of his possession of these bills. I noted carefully the size and shape of the track at the ties, the place of the shooting, and between the ties and the ambush, and in the ambush, and I also took careful notice of the track made by defendant while he was walking about the town of Jacksonville, and I think the tracks were all alike. [Witness described the shape of the shoes worn by defendant, substantially as did the witness Reagan.] One of the shoes defendant had on when I arrested him had a strap on it, and the other had none; there was a sign on the back inside of the shoe showing that a strap had been broken off. [Witness was shown the shoe strap identified by Reagan and Strain.] I made a comparison of this shoe strap with the strap on defendant's shoe that he was wearing when arrested, and they were alike in every particular. [Witness was shown bottle of mucilage identified by other witnesses.] By direction of Sheriff Reagan, I took this bottle of mucilage to Tyler to see if I could find any mucilage like it. I found the same kind at Johnson's drugstore, on the north side of the square, in Tyler, and could find none elsewhere. The bottle in Johnson's drugstore had cost marks, just as this bottle has. I brought the defendant to Rusk from Jacksonville in a

hack. John H. Meeks and Mr. Ezell were along. I do not remember to have warned the defendant at all. I am acquainted with the sawmills on the railroad between this point and Lufkin, and there is no sawmill within two miles of Lufkin that is owned by a man named Jones. I recognized the chain and charm that I took off defendant as the chain and charm that belonged to Dr. A. F. Drewry, and that he wore before his death. I had seen the chain and charm frequently and knew them well, and know they were owned by Dr. A. F. Drewry just a short time before his death." [Witness identified the watch in court as the watch taken off defendant, and from between his legs, just prior to his arrest.] Witness had seen Dr. Drewry's watch several times, and believed the watch he took from defendant to be Dr. Drewry's, but would not be positive. Witness stated positively that there was no bottle of mucilage in defendant's valise at the time he was arrested.

The State further introduced as evidence in the case:

1. The full beard, whiskers, and mustache found near the place of the shooting and on the track of the person who did the shooting, and same was identified by witness Isaiah Thomas as having been in the possession of the defendant King some few weeks before the killing.

2. The shoe strap found on the track of the person who did the killing, near the scene of the homicide, and shown by the witnesses John B. Reagan, E. T. Dorough, and John W. McCord, to be on comparison precisely like the strap on the shoe of defendant, the strap being torn off of one of defendant's shoes, and the strap being on the other shoe of defendant at the time of his arrest, about forty hours after the shooting.

3. The bottle of mucilage found near the place of the shooting, and near the track of the person who did the shooting, and shown by Miss Allie Storey, J. W. Storey, and J. S. Johnson to be the bottle of mucilage that was in defendant's possession prior to the homicide.

4. The 45-caliber cartridges and cartridge shell found at the place of the shooting, and by the track of the person who did the shooting, and shown by the witnesses Reagan, Dorough, and McCord to be of the size, make, and appearance of the cartridges found on defendant at the time of his arrest.

5. The 45-caliber cartridges found on defendant at the time of his arrest, shown by the witnesses Reagan, Dorough, and McCord to be similar in every respect to the cartridge and cartridge shell found at the place of the killing, and by the track of the person who did the killing; all said cartridges fit defendant's pistol.

6. The cartridge ball that was extracted from the body of the deceased, and the ball that was taken out of the shell of one of the cartridges that was in defendant's pistol at the time of his arrest, and weighed in comparison with each other by Dr. A. H. McCord.

7. The Colt's improved 45-caliber, single-action, center-fire, 7½-inch barrel, gutta percha handle, nickel-plate six-shooter pistol that de-

fendant had on his person at the time he was apprehended, and as shown to be defendant's pistol, that he ordered at the same time he ordered the pistol-holder and false beard.

8. The pistol-holder that defendant had on his person at the time of his capture, and that he ordered at the same time that he ordered the pistol and false beard.

9. The gold-filled watch, gold-plated chain and charm found on the person of defendant, and worn by him between his legs at the time of his arrest, and shown by Mrs. Drewry, E. T. Dorough, J. F. Mallard, George Rodgers, and others to be the watch, chain, and charm of deceased, A. F. Drewry.

10. The purse and silver, eight silver dollars and sixty cents in change, found on the person of defendant at the time of his arrest, defendant telling witness Dorough that it was all the money he had.

11. The three five-dollar bills found in a novel in defendant's valise at the time of his arrest; one of the bills had a corner torn square off, and was the bill deceased received from Tom Singletary the evening of August 18th, as testified to by Singletary and Black.

12. The small tin-handle brush used in mucilage bottle, and found in pocket of defendant at the time of his incarceration.

13. The small black valise in possession of defendant at the time of his arrest.

14. The pair of shoes worn by defendant at the time of his arrest, one shoe strap on, and the other had the strap torn off.

No briefs have come to the hands of the Reporter.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—This is a conviction for murder of the first degree, with the death penalty assessed. Upon the trial, appellant filed his first application for a continuance, which showed that appellant desired the testimony of H. H. Parker, who resided in Bexar County, and Sam Smith, whose residence was not known, but who was believed to be in Dallas County, and Andrew Harrison, who resided in Cherokee County. The appellant was indicted on August 20, 1894, and was arrested immediately thereafter. The defendant was in custody on this charge from November 13, 1894, and no act of diligence is shown until December 1, 1894, when, for the first time, he caused attachments to issue in this case. If, however, it be conceded that the defendant was not put upon notice of the importance of this testimony until after the first trial of this case, which occurred November 26, 1894, being at the same term of the court, it does not appear to us that the testimony as to Parker was material, or that the testimony of Smith, if it could have been procured at all, was probably true, and it is not disclosed what defendant expected to prove by the witness Harrison. The defendant states as to Parker, that he expected to prove

by him that there was another man with him when the bottle of mucilage was bought from said Parker, in Tyler, Texas, and that defendant did not buy said mucilage; but the fact that the bottle of mucilage in question was subsequently found in defendant's possession at Story's, a few miles from Tyler, where he was working, renders it immaterial whether he bought it himself, or some one who was with him bought it for him. As to witness Smith, it is shown that he was an ex-convict, and it is not shown that he had been pardoned, or would have been permitted to testify could his attendance have been procured; and it is exceedingly improbable that this witness would have taken upon his own shoulders the full responsibility for the murder of Dr. Drewry, and would have exculpated the appellant, as alleged in his motion for continuance. Besides, the testimony in the case shows, if said testimony could have been procured, that there was no probable truth in it; and also the residence of this witness is not shown, and no reasonable probability is shown that his attendance could have been procured by a continuance of the case.

The appellant objected to the introduction of the witness Carroll Smith, because he was not placed under the rule, which had been invoked by the State. The judge's explanation to the bill shows, that at the time the witnesses were placed under the rule, it was stated that there were other witnesses not present who would be sworn and placed under the rule as soon as they came in. Two witnesses were examined before Smith came in and was sworn. On his voir dire, it was shown that he had heard none of the testimony of the other witnesses, and we fail to see any abuse of the discretion of the court in permitting him to testify.

The testimony of this witness as to the dying declarations of deceased was also objected to, upon the ground that deceased was not at the time of making such declarations conscious of approaching death. The deceased was shot late Saturday evening, and the declaration proposed to be adduced from the witness was made to him some time Sunday evening. The witness himself says that the deceased was suffering greatly, and told him during the conversation that he was bound to die, but he could not remember whether this statement was made before or after he told him how he was shot. The deceased had, however, to a number of persons, from the time he was shot up to the time this statement was made, stated that he was fatally shot, and was bound to die, and he never at any time expressed any hope of recovery; and in our opinion, it does not matter whether or not he stated to witness Smith that he was conscious of approaching death, in order to have rendered this statement admissible. The foregoing applies to the testimony of the witness Reagan as to dying declarations by deceased. Hunnicutt v. The State, 18 Texas Crim. App., 498; Rex v. John, 2 Ben. & H. Lead. Crim. Cases, 393.

As to the objections urged against the admissibility of the testimony of the witness Bailey, it appears that he was, at the time the fatal shots

were fired at Wells, from one-fourth to one-half mile distant from the scene of the homicide, and heard the shots. The engine immediately ran back from the scene of the homicide to Wells, and in a very few minutes witness, with others, took passage, and ran down to where deceased was. They found him struggling and suffering intense pain. He immediately told them he was shot in the back, the ball penetrating his bowels, and that he could not recover, that he was killed, and then told them of the circumstances attending the shooting, describing the person who did it. This evidence was clearly admissible, both as a dying declaration and as a part of the res gestæ. Lewis v. The State, 29 Texas Crim. App., 203, and authorities there cited.

The defendant also contends that this cause should be reversed, because the evidence is not sufficient to support the verdict of the jury. The testimony in this case is purely circumstantial, but it is so complete as to have connected the defendant by a chain of circumstances pointing to him as the guilty perpetrator of one of the most diabolical and cold-blooded murders that has ever stained the annals of this State. The object of this murder appears to have been robbery, and it was planned for weeks before its consummation. On the part of the defendant it was well and skillfully planned, and all his movements conducted so as to avoid and escape detection. But, notwithstanding this, the State was enabled to bring to bear an array of facts establishing to a moral certainty, and excluding every reasonable hypothesis consistent with the defendant's innocence, that the defendant, and he alone, was guilty of this crime. He was ably defended in the court below. The court gave him a fair and impartial charge, and an intelligent jury of his own selection, responding to their obligations, found him guilty of the highest crime known to our code, and assessed his punishment at death; and we find no error in the procedure leading thus to conviction, and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.